Norman BREAZEALE, Jr., et al.

v.

The B.F. GOODRICH COMPANY.

Civ. A. No. 80–4983.

United States District Court,
E.D. Louisiana.

June 9, 1983.

Bernard Smith, Covington, La., for plaintiffs.

John J. Weigel, New Orleans, La., for defendant.

**CHARLES SCHWARTZ, Jr., District Judge.**

This matter was tried before the Court, sitting without a jury, on a former day, at which time it was taken under submission. After consideration of the record herein, the evidence adduced at trial, the briefs of counsel, and the law, the Court finds as follows.

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

### FINDINGS OF FACT

Decedent, Norman Breazeale, Jr. (Al), son of the plaintiffs, was employed on August 1, 1980 as a tire repairman by O'Keefe Tire & Supply Company in Mandeville, Louisiana and had been so employed for approximately two to three months prior to the accident which forms the basis for this lawsuit. On August 1, 1980, the decedent was mounting a tire manufactured by defendant, The B.F. Goodrich Company (Goodrich), which tire was classified as an "agricultural," or "off-road" tire. It was manufactured by Goodrich in July, 1975 and was owned by the Beau Chene Country Club which utilized the tire at its golf club. Robroy B. McIntosh, the golf course superintendent at Beau Chene, brought the tire to O'Keefe's for repair the day before the accident. Eugene Barber, the manager of O'Keefe's in August, 1980, was present in the facility on the date of the accident. He had assigned the repair job of the Beau Chene tire to Al and another employee. He did not see Al before the accident but was

standing nearby when the tire exploded and propelled Al, who was sitting on the tire, to the ceiling.[1] Decedent was taken to St. Tammany Parish Hospital and transferred to East Jefferson Parish Hospital where he remained until his death on August 21, 1980.

The decedent's parents sued Goodrich claiming that the tire which exploded was defective by reason of faulty manufacture of the bead of the tire or by virtue of insufficient warnings as to proper inflation pressures of the tire. It is undisputed that the tire which the decedent was repairing on August 1, 1980 had the following molded markings:

B.F. Goodrich

12–28

B.F.G. Silvertown

13.6–28

N.D. Tractor

4-Ply Rating Nylon

R–3

0335R001

F–37A

A–8753–1

E11812–BXA–1

Made in U.S.A.

The tire bore no precautionary warnings molded in the rubber as to the maximum air pressures to be tolerated or as to the hazards of bead breakage or over-inflation. A removable gum label was affixed to the tire at the time of manufacture which warned of potential harm while filling the tire with air due to bead breakage and/or overinflation.[2] Goodrich stipulated that it was feasible as of the date of manufacture to mold on the sidewall a warning as to the maximum inflation pressures with respect to tires of the style and model of the tire herein as well as a warning as to dangers

---

1. Exhibit 7 depicts decedent's position at the time of the explosion.

2. Specifically, the label stated:
   "IMPORTANT SAFETY PRECAUTIONS
   (1) Remove rust deposits from rim well and rim flange by buffing or wire brushing. (2) Centering tire and lubricating both beads and rim with approved rubber lubricant or thin solution of vegetable oil soap are extremely important to prevent bead damage. (3) Remote control inflation equipment should be used. Never stand in front or over tire and wheel when inflating. (4) Do not exceed 35 pounds pressure when seating tire beads to rim. (For safety, inflation cage is recommended). (5)After beads have seated properly, remove valve core and completely deflate tire. Reinsert valve core and reinflate to recommended air pressure."

due to overinflation and to urge the use of a steel cage in the repair of said tires. The normal operating pressure of the tire in question was approximately 14 PSI; the maximum air pressure to be used during mounting of the tire was 35 PSI. As of the date of manufacture of the tire involved in the accident, Goodrich had distributed to tire dealers and stores general warnings as to the hazards in mounting tires of the same style and model as the tire herein.[3]

It was the opinion of George Pappas, whom the Court qualified as an expert in chemical engineering, but not in tire failure analysis, that the bead of the tire was defective. Pappas' initial determination, however, based on a visual inspection of the tire and tube, was that the bead bundles and tread were in good condition, excluding impact damage, and that the tire appeared to have been properly manufactured. It was only after Pappas took issue with the Goodrich report and had inspected the x-rays of the tire taken by Goodrich that he concluded that the tire was improperly manufactured. The Goodrich report indicated that the wires which comprise the bead bundle broke in succession due to excessive tension. Improper seating and too much air cause the inside layers of the bead to carry the whole load. One wire breaks, followed by the rest in succession. It was Pappas' ultimate determination that the beads broke at the same instant, in unison, thus indicating a manufacturing defect. However, Pappas testified that he has not tested beads under tension nor observed any actual failure of beads. Additionally, he testified that he made his determination even though he had no knowledge of the condition or location of the tire at the time of the accident nor any of the facts which formed the basis of the accident.

The Court finds that it cannot give much weight to Pappas' findings based on his obvious lack of familiarity with and knowledge of the accident in question and the behavior of bead bundles under tension. The Court does give credence to the testimony of Albert Tribuzi, a Goodrich employee of 23 years, who qualified as an expert in mechanical engineering and additionally qualified to give opinion testimony relative to tire analysis and failure. Tribuzi concluded that there was no manufacturing defect or structural weakness in the tire. The x-rays taken of the tire reveal a cupcone effect which results when a bead breaks from improper seating, not from defective manufacturing. It was his testimony that if the bead does not seat initially, more air will usually correct the problem, and that most people wait for a "pop" to indicate that the bead has seated. However, Tribuzi stressed that the "pop" does not always assure that the bead has seated so it is not a reliable indicator. In rare instances, the bead will hang up and more air will only result in an explosion. A bead can "hang up" due to a pinched tube, rust, insufficient lubricant, or if a foreign object is caught between the bead and the flange. A pinched tube occurred in this case. The tire was lying flat on the floor of the garage; under these circumstances, according to Tribuzi, a person could not tell if the bead was hung up on the bottom, or underneath side. The Goodrich report indicates that both the bead and the tube popped on the bottom side. Tribuzi further testified that a bead will break at 70 PSI if improperly mounted, and at 120–190 PSI if properly mounted. Goodrich literature recommends that no more than 35 PSI is to be used to seat beads, thus creating a safety margin of 2:1. In this case, it was impossible to determine the actual air pressure in the tire at the time of the explosion. According to Tribuzi, there were too many factors involved to make such a determination. He concluded, based on the information available, that the bead was improperly seated and that the tire was inflated beyond 35 PSI, which resulted in the following sequence of events: the inside layers of the bead were forced to carry the whole load; one wire broke, with the remaining wires then breaking in succession; the bead broke, splitting the inner tube. The released air pressure propelled the tire and the decedent to the ceiling of the repair shop.

**3.** Trade Publication Warnings (Exhibits 53, 54).

## CONCLUSIONS OF LAW

The Court has jurisdiction over this diversity action brought pursuant to 28 U.S.C. § 1332. Louisiana law governs the plaintiffs' products liability and negligence claims. Under this law, a manufacturer of a product which involves a risk of injury to the user is liable to any person, who, without fault on his part, sustains an injury caused by a defect in design, composition or manufacture of an article, if the injury might reasonably have been anticipated. *Hebert v. Brazzel,* 403 So.2d 1242 (La.1981). The plaintiff claiming injury has the burden of proving that the product was defective, and that the plaintiff's injuries were caused by reason of the defect. *Id., Weber v. Fidelity & Casualty Co. of New York,* 250 So.2d 754 (La.1971).

There has been no showing by the plaintiffs that the tire in question was defectively manufactured or designed. Goodrich introduced substantial evidence to indicate that the tire exploded due to excessive air pressure, and not from any internal weakness. The testimony of plaintiffs' expert witness, who had no experience in testing for structural weaknesses in tires, and who was unfamiliar with the facts of the case, and who only concluded that the tire was defective after he received Goodrich's report, did not carry sufficient weight to overcome defendant's findings. We conclude therefore, that the tire was not defectively manufactured or designed.

Plaintiffs argue, moreover, that the tire was also defective in that it was unreasonably dangerous to normal use. "Unreasonably dangerous" means that "the article which injured the plaintiff was dangerous to an extent by and that which would be contemplated by an ordinary consumer (or user)." *DeBattista v. Argonaut-Southwest Insurance Company,* 403 So.2d 26, 30 (La. 1981). The testimony of those employees at O'Keefe's who had repaired agricultural tires indicates that, while no formal training was given as to the proper methods to be employed when changing this type of tire, they were all aware of the method via "on-the-job" training. Benjamin O'Keefe testified that he told Al to use a remote chuck (a type of remote control inflation equipment) and to stand clear when filling agricultural tires, and that every time he observed Al changing this type of tire, he used this procedure. Additionally, O'Keefe testified that Al was told never to sit on or lean over tires while inflating them. Eugene Barber related that Al has fixed tractor tires before, and that he personally had cautioned the employees against sitting on tires prior to the accident in question. According to Barber, the shop repaired three to four agricultural tires per week and Al fixed most of them. Barber testified that the remote chuck permitted the user to stand away from the tire, but did not give the user any control over air flow. There was a valve with a gauge that could control air pressure, but it was used mostly by truck drivers who came into the shop. While this piece of equipment was available, Al had not used it, according to Barber, when repairing agricultural tires. It is clear from this testimony that an ordinary user, such as decedent, would not fail to contemplate the danger involved in filling an agricultural tire with air. We thus find that an ordinary tire repairman would appreciate the danger involved in mounting such a tire.

Plaintiffs also argue that the manufacturer failed to warn of the dangers which would accompany the use of too much air pressure when mounting an agricultural tire. A manufacturer must give warning of any danger which is not within the knowledge of any ordinary user, such as decedent. *Hebert v. Brazzel,* supra. However, the record provides sufficient basis to conclude that the danger of an explosion when filling an agricultural tire with air *was* obvious to an ordinary worker. Considering the lack of evidence that the tire was defective in its manufacture, design, or by a failure to warn of the dangers inherent in its use, plaintiffs' products liability claim must fall.

Plaintiffs also allege that Goodrich was negligent in failing to mold on the tire a warning as to the proper inflation pressures to be utilized in seating of the tire bead. Negligence is conduct which falls

below the standard established by law for the protection of others against unreasonable risk of harm. It is the breach of a duty, statutory or nonstatutory, owed to another to protect that person from the particular harm that ensued. *Callais v. Allstate Insurance Co.*, 334 So.2d 692 (La.1976). In this case Goodrich owed a duty to protect those persons who handle their tires from the risks involved in that undertaking. The issue is whether Goodrich breached that duty by failing to mold on the tires information as to maximum air pressure in August, 1980. We cannot say that the mere failure to mold such a warning onto the tire is the type of conduct which can be held to constitute a breach of Goodrich's duty under the circumstances. Defendant had displayed various warnings in its trade publications which clearly indicated that tire mounting can be dangerous and that certain precautions should be observed. These precautions were known to the decedent as the record reveals that he had been instructed on previous occasions by both the shop owner and manager as to proper inflation pressures to be utilized in the seating of the bead in agricultural tires. Yet despite an apparent knowledge of the dangers involved in mounting such a tire, the decedent was squatting on top of the rim. Additionally, a clip-on valve was available that would have enabled the decedent to inflate the tire from a position of safety. It is clear that the decedent knew or should have known of the dangers involved in the procedure of mounting a tire, yet it appears he chose to ignore those risks. In light of his behavior we cannot say that the accident would not have occurred had the maximum air pressure to be used in the tire been molded on the side. In fact, we conclude that the cause of the accident was decedent's over-inflating the tire which resulted from his failure to follow certain procedures which common sense would have dictated could have avoided the accident. Manufacturers need not warn of dangers of improper usages which are obvious, or which should be known by the ordinary user. *Lovell v. Earl Grissmer Co., Inc.*, 422 So.2d 1344 (La.App. 1st Cir.1982). Accordingly, there should be judgment herein in favor of the defendant, dismissing plaintiffs' claims at their cost. The Clerk of Court is directed to enter a judgment in accordance herewith.